**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ROBERT E. JONES,
Plaintiff-Appellant,

v.

AMERICAN POSTAL WORKERS UNION,
NATIONAL; AMERICAN POSTAL
WORKERS UNION, LOCAL NUMBER
4755,

No. 97-2584

Defendants-Appellees,

and

PATRICIA FERN BUTTS,
Defendant.

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,
Amicus Curiae.

Appeal from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
W. Craig Broadwater, District Judge.
(CA-96-22-3)

Argued: June 8, 1999

Decided: September 10, 1999

Before ERVIN, HAMILTON, and WILLIAMS, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Hamilton wrote
the opinion, in which Judge Ervin and Judge Williams joined.

_____

**COUNSEL**

**ARGUED:** Robert E. Jones, Appellant Pro Se. Robert John Gregory, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. Susan Lynne Catler, O'DONNELL, SCHWARTZ & ANDERSON, P.C., Washington, D.C., for Appellee. **ON BRIEF:** C. Gregory Stewart, General Counsel, Philip B. Sklover, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Curiae. Peter J. Leff, O'DONNELL, SCHWARTZ & ANDERSON, P.C., Washington, D.C., for Appellees.

_____

**OPINION**

HAMILTON, Circuit Judge:

The principal issue in this appeal is whether a labor union that represents federal employees may constitute a labor organization as that term is defined in the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12101 - 12213, and therefore be subject to suit in federal district court for violations of 42 U.S.C. § 12112(a). Because the ADA provides that the term "labor organization" shall have the same meaning given that term in Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, a sister statute, resolution of the principal issue requires us to resolve the antecedent question of whether a labor union that represents federal employees may constitute a labor organization as that term is defined in Title VII. For the reasons that follow, we hold a labor union that represents federal employees may constitute a labor organization as that term is defined in Title VII and by proxy the ADA.

I.

At approximately 11:45 a.m. on June 20, 1994, the Postmaster of the United States Post Office in Martinsburg, West Virginia (the Post Office), Sebastian Giargiano (Postmaster Giargiano), determined that United States Postal Service (the Postal Service) employee Robert

Jones (Jones) was acting strangely on the job and was in need of medical treatment. The Postal Service employed Jones as a claims/inquiry clerk. Postmaster Giargiano decided to transport Jones via automobile to the Medical Center for the Department of Veteran's Affairs (the Medical Center) in Martinsburg. Just prior to leaving the Post Office, Jones handed Postmaster Giargiano an envelope and said this letter is for you. Believing the envelope contained ordinary mail, Postmaster Giargiano tossed it on his desk for reading upon his return.

On the way to the Medical Center, Jones told Postmaster Giargiano that he intended to kill his supervisor, Kim Mickelinc (Mickelinc), that day. He also told Postmaster Giargiano that the system was winning, he could not handle it any more, and that things would be better if Mickelinc was dead. Upon arrival at the Medical Center, Jones was admitted as a psychiatric patient under the care of Dr. Kodali.

Upon returning to the Post Office after transporting Jones to the Medical Center, Postmaster Giargiano opened the envelope Jones had given him and read Jones's handwritten letter inside. The letter appeared to Postmaster Giargiano to be a suicide note. Postmaster Giargiano notified, among others, the Manager of Human Resources in the Appalachian District for the Postal Service, James Cox, and Postal Inspector Steve Randolph (Inspector Randolph) about the letter and about hearing Jones verbally threaten the life of Mickelinc.

During the next few weeks, the Postal Service investigated the matter. As part of the investigation, Inspector Randolph submitted a report dated July 19, 1994 to Dennis Moles, the Acting Manager of Post Office Operations in Charleston, West Virginia. The report stated that Patricia Butts (Butts), the Secretary-Treasurer of the Eastern Panhandle Local Number 4755, American Postal Workers Union (the Local),[1] informed him (Inspector Randolph) that at a union meet-

_____

[1] The Local is chartered by the American Postal Workers Union, AFL-CIO (the APWU). The APWU is an unincorporated labor organization with its headquarters in Washington, D.C. At all times relevant to this appeal, the APWU was recognized by the Postal Service as the exclusive collective bargaining representative of postal employees in the clerk, maintenance, and motor vehicle service crafts nationwide pursuant to 39 U.S.C. § 1203. The Local is an autonomous unincorporated labor organization with its own bylaws and officers.

3

ing approximately one week after Jones threatened to kill Mickelinc, those present unanimously expressed objections to Jones returning to work. The report also states that Butts informed him that Jones's fellow employees would feel very worried and apprehensive if Jones returned to work. Butts repeated the same information a short time later to Postmaster Giargiano.

Dr. Kodali discharged Jones from the Medical Center on July 13, 1994 with a discharge diagnosis of schizophreniform disorder and post traumatic stress syndrome.**2** Dr. Kodali's discharge instructions recommended Jones spend one month convalescing. Postmaster Giargiano thereafter authorized advance sick leave for Jones through August 9, 1994. On a form provided by the Postal Service and dated August 3, 1994, Dr. Asghar, Jones's treating physician at the Medical Center for two years, stated that Jones's prognosis was "[f]air to good," and that Jones could return to work without restriction on August 13, 1994. Dr. Asghar did state on the form, however, that consideration should be given to reducing the amount of time Jones spent with the public.

On August 8, 1994, Postmaster Giargiano advised Jones by written memorandum that effective August 13, 1994 he would be in off-duty status, without pay, until the Postal Service advised him otherwise. The memorandum informed Jones that the Postal Service took this action because his "retention in a duty status may be injurious to [him]self or others." (J.A. 126). The memorandum then described Jones's death threat against Mickelinc in detail.

On September 6, 1994, Postmaster Giargiano gave Jones written notice of his proposed discharge from the Postal Service no sooner than thirty days from Jones's receipt of the notice. The notice cited Jones's improper conduct with respect to his death threat against Mickelinc and his suicide letter. The notice also stated that a letter of warning dated April 18, 1994, for improper conduct, would be con-

_____

**2** Notably, in response to a letter dated July 5, 1994, by Postmaster Giargiano to Dr. Kodali asking whether Jones was a possible danger to other employees, Dr. Kodali stated: "He is not dangerous to himself or others at this time. However, he is afraid of losing control if he returned to his office or home." (J.A. 136).

4

sidered in deciding whether Jones's proposed discharge should be sustained by senior Postal Service officials.**3** Senior Postal Service officials sustained the decision to discharge Jones, and Jones was officially discharged on November 7, 1994.

The Local grieved Jones's discharge through the grievance procedures of the applicable collective bargaining agreement and won a reversal of his discharge in arbitration. The arbitration award of July 18, 1995, set aside Jones's discharge and converted it to a three-year medical leave of absence, thus allowing Jones to return to duty when he passes a fitness-for-duty examination and is no longer collecting workers' compensation benefits for his mental condition.

On April 3, 1996, Jones filed this action against the APWU in the United States District Court for the Northern District of West Virginia, and on April 19, 1996, he amended his complaint to add the Local as a defendant.**4** Jones's complaint alleged that Butts's negative comments about him to Inspector Randolph and Postmaster Giargiano were made in her capacity as Secretary-Treasurer of the Local and were a substantial factor in his discharge. According to Jones's complaint, Butts's comments amounted to intentional discrimination by APWU and the Local (the Defendants) against an individual with a disability in violation of the ADA.

On October 16, 1996, the Defendants filed a motion to dismiss the action for lack of subject matter jurisdiction, see Fed. R. Civ. P. 12(b)(1), and alternatively for summary judgment, see Fed. R. Civ. P. 56(c). In support of their motion to dismiss for lack of subject matter jurisdiction, the Defendants argued that the district court lacked subject matter jurisdiction, because (1) they were not"labor organizations" as that term is defined in the ADA, and therefore not subject

_____

**3** The joint appendix on appeal does not disclose the contents or specific nature of this letter.
**4** He also amended his complaint to add Butts as a defendant but the district court subsequently dismissed her as a party. Jones has not appealed that dismissal, and therefore, Butts is not a party to this appeal.

From hereafter we will refer to the APWU and the Local collectively as the Defendants.

5

to suit as covered entities under the ADA, and (2) the Rehabilitation Act of 1973, 29 U.S.C. §§ 701-796l, which does not subject them to suit, provided Jones the only means of remedying the allegations in his complaint. On April 7, 1997, Jones filed a motion for summary judgment.

On April 25, 1997, the district court denied the opposing motions and discovery proceeded. On September 12, 1997, the Defendants renewed their motion for summary judgment, but also reiterated their arguments asserting lack of subject matter jurisdiction. In an opinion dated November 12, 1997, the district court: (1) held that it lacked subject matter jurisdiction over Jones's complaint for the two reasons argued by the Defendants; (2) granted the Defendants' motion for summary judgment on that basis; and (3) dismissed the case from its docket. Jones noted a timely appeal, in which the Equal Employment Opportunity Commission (the EEOC) has filed an amicus brief.

II.

In this appeal, Jones challenges the district court's determination that it lacked subject matter jurisdiction over his ADA claims against the Defendants. Jones has the burden of proving the existence of subject matter jurisdiction. See Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999). The existence of subject matter jurisdiction is a threshold issue, which this court must address before addressing the merits of Jones's ADA claim. See Steel Co. v. Citizens for a Better Env't, 118 U.S. 1003, 1012-13 (1998) (reaffirming holding that a federal court may not hypothesize subject matter jurisdiction for the purpose of deciding a case on the merits). We review a district court's determination that it lacked subject matter jurisdiction de novo. See Ahmed v. United States, 30 F.3d 514, 516 (4th Cir. 1994).

Below, the district court held that it lacked subject matter jurisdiction upon two alternative grounds. First, the district court held that labor organizations that represent federal employees may not constitute covered entities under the ADA, and therefore are not subject to suit in federal district court for violations of 42 U.S.C. § 12112(a). Second, the district court held that the Rehabilitation Act of 1973, which does not subject the Defendants to suit, provides the exclusive means by which an employee of the Postal Service may seek redress

6

for employment related disability discrimination. We address each of these grounds in turn.

A. Are Labor Organizations That Represent Federal Employees Covered Entities Under the ADA?

Under the ADA "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). The ADA defines the term "covered entity" as "an employer, employment agency, labor organization, or joint labor-management committee." Id. § 12111(2). A district court lacks subject matter jurisdiction over an ADA claim lodged against a defendant that is neither an employer, employment agency, labor organization, nor a joint labor-management committee as those terms are defined in the ADA. See Woodward v. Virginia Bd. of Bar Examiners, 598 F.2d 1345, 1346 (4th Cir. 1979) (affirming dismissal of Title VII claim for lack of subject matter jurisdiction because defendant was neither an "employer," an "employment agency," nor a "labor organization" as those terms are defined in Title VII). See also Scarfo v. Ginsberg, 175 F.3d 957, 961 (11th Cir. 1999) (holding that whether defendants constituted "an`employer'" within Title VII is a question of subject matter jurisdiction); Armbruster v. Quinn, 711 F.2d 1332, 1335 (6th Cir. 1983) (same). But see Sharpe v. Jefferson Distributing Co., 148 F.3d 676, 677-78 (7th Cir. 1998) (holding that question of whether employer has more than fifteen employees so as to be subject to Title VII is not jurisdictional, but merits related), abrogated on other grounds by Papa v. Katy Industries, Inc., 166 F.3d 937, 939-40 (7th Cir. 1999); EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 623-24 (D.C. Cir. 1997) (holding that question of whether defendant was a covered entity under ADA is not jurisdictional, but merits related). According to Jones, the Defendants constitute labor organizations as the term labor organization is defined in the ADA. Thus, this appeal presents the question of whether a labor organization that represents federal employees may constitute a covered entity under the ADA.

To answer this question, we must first examine the relevant statutory language chosen by Congress to express its intentions. See

Holloway v. United States, 119 S. Ct. 966, 969 (1999). If the intent of Congress is clear, then our analysis proceeds no further, for we "must give effect to the unambiguously expressed intent of Congress." Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984). In the event the statutory provision or provisions at issue are ambiguous, "the question then becomes one of whether the interpretation by the agency charged with its administration is a permissible one." See Adams v. Dole, 927 F.2d 771, 774 (4th Cir. 1991).

As previously stated, Congress defined the term"covered entity" in the ADA as "an employer, employment agency, labor organization, or joint labor-management committee," 42 U.S.C. § 12111(2) (emphasis added), and expressly incorporated Title VII's definition of "labor organization," see id. § 12111(7). For its part, Title VII defines "labor organization" as:

> a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

Id. § 2000e(d) (emphasis added). Title VII goes on to state in a separate subsection of its definitional section that a labor organization "shall be deemed to be engaged in an industry affecting commerce," if it maintains a hiring office or has fifteen or more members and falls within one of the following five categories:

> (1) is the certified representative of employees under the provisions of the National Labor Relations Act . . ., or the Railway Labor Act . . .;
>
> (2) although not certified, is a national or international labor organization or a local labor organization recog-

8

nized or acting as the representative of employees of an <u>employer</u> or <u>employers</u> engaged in an industry affecting commerce; or

(3) has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of <u>employers</u> within the meaning of paragraph (1) or (2); or

(4) has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

(5) is a conference, general committee, joint or system board, or joint council subordinate to a national or international labor organization, which includes a labor organization in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

<u>Id.</u> § 2000e(e) (emphasis added).

The ADA also expressly adopts Title VII's definitions of "commerce" and "industry affecting commerce." <u>See id.</u> § 12111(7). Title VII defines the term "commerce" as "trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof." <u>Id.</u> § 2000e(g). Title VII defines an "industry affecting commerce" as "any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes . . . any governmental industry, business, or activity." <u>Id.</u> § 2000e(h). The ADA also defines "employee" and "employer" in language that closely approximates the definitions of those terms in Title VII. <u>Compare</u> 42 U.S.C. § 12111(4)-(5) (ADA), <u>with</u> 42 U.S.C. § 2000e(b), (f) (Title VII). Notably, both the ADA and

9

Title VII's definition of employer expressly exclude the United States or a corporation wholly owned by the government of the United States. See id. §§ 2000e(b) & 12111(5).

According to the Defendants, when read in concert, the language of 42 U.S.C. §§ 2000e(b) and 2000e(e) makes plain that a labor organization that represents federal employees is excluded from Title VII's definition of the term "labor organization." Subsection 2000e(e), which automatically deems labor organizations to be engaged in an industry affecting commerce under certain conditions, contains references to labor organizations representing "employees of an employer" and "employees of employers." Id. (emphasis added). Similarly, subsection 2000e(d) provides that the term "labor organiza- tion . . . includes any organization . . . in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment . . . ." 42 U.S.C. § 2000e(d) (emphasis added). Because federal employers are excluded from Title VII's definition of the term"employer," see id. § 2000e(b)--even though covered under the separate provisions of 42 U.S.C. § 2000e-16--labor organizations that represent federal employees, the Defendants reason, are exempt from Title VII's prohi- bitions, and by proxy, those of the ADA. This is the analysis relied upon by the district court in concluding that the Defendants were not covered entities under the ADA.

Jones and the EEOC as amicus counter that nothing in § 2000e(e) suggests, let alone makes plain, that it serves as the exclusive means of establishing that a particular labor organization is engaged in an industry affecting commerce. They prefer to characterize § 2000e(e) as merely a descriptive list of certain conditions which, if met, auto- matically equate to a labor organization engaging in an industry affecting commerce. Jones and the EEOC argue that the language of § 2000e(d) broadly covers labor organizations of all kinds. Therefore, at a minimum, if a labor organization that represents federal employ- ees exists for the purpose, in whole or in part, of dealing with the United States or an agency thereof concerning grievances, labor dis- putes, and the like, and is engaged in an "industry affecting com- merce" as that term is defined in § 2000e(h), then that labor organization is subject to the proscriptions of Title VII and by proxy

10

the ADA. Jones and the EEOC point out that an interpretation subjecting labor organizations that represent federal employees to Title VII and ADA liability fully comports with Congress' primary purpose in enacting these statutes of eradicating targeted employment discrimination. Furthermore, Jones and the EEOC point out that the opposite interpretation would lead to the anomalous result, surely not intended by Congress, of nonfederal employees being allowed to sue their employers and labor organizations for violations of Title VII and the ADA, but federal employees only being allowed to sue their employer.

In support of their interpretation, Jones and the EEOC rely upon the Eighth Circuit's decision in Jennings v. American Postal Workers Union, Local 8, 672 F.2d 712 (8th Cir. 1982). Jennings involved the Title VII claim of a Postal Service worker who alleged the American Postal Workers Union, Local 8 "discriminated against her on the basis of race and sex by not adequately representing her in her grievance against [the Postal Service]." Id. at 713. The court stated that "[i]t is clear that Title VII provides a cause of action against labor organizations for unlawful employment practices." Id. at 715. In the court's view, the fact that the union represented federal employees did not change the analysis, although the court acknowledged that a labor organization that represents federal employees could not be sued under 42 U.S.C. § 2000e-16, which provides for suit against a federal department or agency. See Jennings, 672 F.2d at 715 & n.6. The court stressed, however, that in cases where a labor organization is the defendant, the federal employee is pursuing a claim under the general provisions of Title VII prohibiting discrimination by labor organizations. See id. The court concluded that although "[§ 2000e-16(c)] is the exclusive remedy against federal agencies as employers for racial discrimination, . . . it does not limit the rights of employees against unions representing federal employees." Id.

Because the ADA incorporates Title VII's definition of the terms labor organization, commerce, and industry affecting commerce, our first task is to determine whether Congress has unambiguously spoken in Title VII as to whether a labor organization that represents federal employees may constitute a labor organization for purposes of Title VII. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in

11

which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil, 519 U.S. 337, 341 (1997).

After considering these points of reference, we conclude that Title VII's definition of labor organization is ambiguous as to whether a labor organization that represents federal employees may be subject to liability under Title VII. First, the initial clause of Title VII's definition of the term "labor organization"--[t]he term `labor organization' means a labor organization engaged in an industry affecting commerce," 42 U.S.C. § 2000e(d)--begs the question of what is the nature of a labor organization for purposes of Title VII. Second, the balance of the definition, which uses the term "employer," defined in § 2000e(b) as excluding the United States or an agency thereof, merely provides a nonexclusive list of organizations, agencies, employee representation committees, groups, associations, or plans that may constitute a labor organization under Title VII. See West v. Gibson, 119 S. Ct. 1906, 1910 (1999) (holding that Congress' use of the word "including" in the phrase "through appropriate remedies, including reinstatement or hiring of employees with or without back pay," 42 U.S.C. § 2000e-16(b), made "clear that the authorization [of remedies] is not limited to the specified remedies there mentioned"); Federal Land Bank v. Bismark Lumber Co., 314 U.S. 95, 100 (1941) (opining that "the term `including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle"); Dong v. Smithsonian Inst., 125 F.3d 877, 880 (D.C. Cir. 1997) (citing Federal Land Bank for proposition that "the word `includes' normally does not introduce an exhaustive list but merely sets out examples of some `general principle'"), cert. denied, 118 S. Ct. 2311 (1998); Adams, 927 F.2d at 776 (recognizing that the term "including" is "perhaps more often than not the introductory term for an incomplete list of examples"); 2A Norman J. Singer, Sutherland Stat. Const. § 47.23 (5th ed. 1992) ("When `include' is utilized [in a statute], it is generally improper to conclude that entities not specifically enumerated are excluded.").

The third circumstance creating ambiguity is that Title VII has a separate section specifically allowing federal employees to sue the United States for unlawful employment discrimination, but does not contain a parallel section addressing labor organizations that represent federal employees. The fourth circumstance creating ambiguity is that

12

although § 2000e(e) declares when a labor organization shall be "deemed" to be engaged in an industry affecting commerce, it does not purport to define the term "labor organization" itself. Fifth and finally, the legislative history of Title VII and the ADA is silent regarding whether a labor organization engaged in an industry affecting commerce and that represents federal employees is subject to their respective proscriptions.

Because we conclude Title VII's definition of labor organization is ambiguous as to whether a labor organization that represents federal employees may be subject to liability under Title VII, we turn to consider the deference this court should afford the interpretation proffered by the EEOC, the agency charged with primary responsibility for enforcement of Title VII. See Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 441 (4th Cir. 1998). The level of deference that this court should afford the EEOC's proffered interpretation "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Id. (internal quotation marks omitted).

The law is well settled that an agency's interpretation of a statute with which it has been charged with administering and which has been reduced to a regulation is to be fully accepted by a court as long as Congress has not directly spoken as to the precise question at issue and the interpretation proffered by the agency is a permissible one. See Chevron, 467 U.S. at 842-43. This level of deference has come to be known as Chevron deference. We have previously extended Chevron deference to an agency's interpretation of a statute that had not been reduced to a formal regulation, but that had been announced only in Administrative Notices sent to other agencies with which it worked. See Warren v. North Carolina Dep't of Human Resources, 65 F.3d 385, 391 (4th Cir. 1995). Furthermore, we have previously extended Chevron deference to an agency's interpretation of statutory language proffered only in the agency's amicus brief before this court. See Molinary v. Powell Mountain Coal Co. , 125 F.3d 231, 235-36 (4th Cir. 1997), cert. denied, 118 S. Ct. 1056 (1998).

Here, the EEOC has proffered its interpretation of the relevant provisions of Title VII in the form of an amicus brief before this court.

13

But under the circumstances of this appeal, this fact does not make it unworthy of deference, because the EEOC's position is in no sense a post hoc rationalization advanced to defend its past action against attack, and there is simply no reason to suspect that the proffered interpretation does not reflect the EEOC's fair and considered judgment on the statutory interpretation questions at hand. See Auer v. Robbins, 519 U.S. 452, 462 (1997) (the fact that the Secretary of Labor's interpretation of its own regulation was proffered to the Supreme Court in the form of an amicus brief filed at the request of the Court did not make it unworthy of deference, because the Secretary's position was in no sense a post hoc rationalization advanced by an agency seeking to defend past agency action against attack, and there was simply no reason to suspect that the proffered interpretation did not reflect the Secretary's fair and considered judgment on the matter in question). Rather, under the circumstances of this case, we believe full Chevron deference is appropriate. After reading the EEOC's brief and listening to its presentation at oral argument, we are convinced the EEOC thoroughly considered the statutory interpretation issues at hand.[5] Furthermore, as we will explain in greater detail momentarily, we find its reasoning valid. Additionally, the EEOC's position is consistent with its express agreement in its Compliance Manual with the Eighth Circuit's holding in Jennings. See EEOC Compliance Manual, Vol. II, § 605, App. 605-N (issued January 29, 1998). Finally, there is no evidence that the EEOC's proffered interpretation is inconsistent with an earlier or later pronouncement.

Having determined that the EEOC's interpretation is entitled to full Chevron deference, we must next determine whether the EEOC's proffered interpretation is "based on a permissible construction of the statute." Chevron, 467 U.S. at 843. If it is, then we must sustain the EEOC's interpretation. See Molinary, 125 F.3d at 235. We have no trouble in concluding that it is. Section 2000e(d) can reasonably be interpreted to mean that, at a minimum, if a labor organization representing federal employees exists for the purpose, in whole or in part, of dealing with the United States or an agency thereof concerning grievances, labor disputes, and the like of the federal employees it represents and is engaged in an "industry affecting commerce" as that

---

**5** In this regard, we note that Jones ceded nearly the full amount of his time to present oral argument to the EEOC.

14

term is defined in § 2000e(h), then that labor organization is subject to the proscriptions of Title VII and by proxy the ADA. This interpretation fully comports with Congress' primary purpose in enacting those statutes of eradicating certain employment discrimination. Such an interpretation avoids the anomalous result, surely not intended by Congress, of nonfederal employees being allowed to sue their employer and labor organizations for violations of Title VII and the ADA, but federal employees only being allowed to sue their employer.

There is no dispute in this case that the Defendants represent federal employees and exist for the purpose in whole or in part of dealing with the Postal Service concerning grievances, labor disputes, and the like. Furthermore, the Defendants' significant representational activities on behalf of Postal Service employees fully support the conclusion that the Defendants are engaged in activities in commerce. See 42 U.S.C. § 2000e(h). Accordingly, the Defendants constitute labor organizations for purposes of Title VII liability and by proxy the ADA.

B. Does the Rehabilitation Act of 1973 Provide the Exclusive
       Means of Remedying Disability Discrimination in Federal
       Employment?

As an alternative basis of challenging the district court's subject matter jurisdiction, the Defendants argue that 29 U.S.C. § 791 is the exclusive means by which a federal employee can remedy disability discrimination in connection with his or her federal employment. In § 791, Congress provided for employment of disabled individuals by federal departments, agencies, and instrumentalities and the formation of affirmative action plans in federal employment. In 29 U.S.C. § 794a(a)(1), Congress provided that the "remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-16) . . . shall be available, with respect to any complaint under section 791 of this title, to any employee or applicant for employment aggrieved by the final disposition of such complaint, or by the failure to take final action on such complaint." Because § 2000e-16(b) sets forth that federal employees alleging employment discrimination may file civil actions in which "the head of the department, agency, or unit, as appropriate, shall be the defendant," the

15

Defendants argue that Jones is implicitly prohibited from filing a civil action against them alleging disability discrimination under the ADA.

In support of their argument, the Defendants rely on the Supreme Court's decision in Brown v. General Servs. Admin., 425 U.S. 820 (1976). Brown involved an employee of the General Services Administration (GSA), Clarence Brown (Brown), who believed that he was the victim of race discrimination in failing to be promoted. See id. at 822. Brown sought administrative relief through GSA, but to no avail. Forty-two days after GSA rendered its final decision denying Brown administrative relief, Brown filed suit against the GSA in federal district court. See id. at 822-23. Brown alleged claims of race discrimination under § 2000e-16 and 42 U.S.C. § 1981. See Brown, 425 U.S. at 823. The district court dismissed the action for lack of subject matter jurisdiction. The Supreme Court affirmed on the basis that § 2000e-16 "provides the exclusive judicial remedy for claims of discrimination in federal employment," and Brown failed to file his civil action within thirty days of the final decision of GSA as required by § 2000e-16(c). Id. at 835.

The Defendants seize upon the language just quoted from Brown in making their exclusivity argument. See Newbold v. USPS, 614 F.2d 46, 47 (5th Cir. 1980) (opining without further discussion that "the Brown court's broad language on preemption and exclusivity suggests that there is no cause of action against individuals under § 1981 . . ."). In this regard, the Defendants miss the mark by a wide margin because the Supreme Court's holding presupposes that the suit at issue is only lodged against an agency of the federal government. The heart of the issue in the case was whether Congress intended to preclude a federal employee from alleging a civil rights violation against the federal government, with respect to his employment under the general civil rights statute codified at § 1981, by enacting a statute specifically providing federal employees with a mechanism for suing the federal government for employment discrimination by naming the appropriate department, agency, or unit head. In holding in the affirmative, the Court considered and relied upon the relevant legislative history of § 2000e-16, the language of § 2000e-16, the sovereign nature of the United States, and the cannon "that a narrowly tailored employee compensation scheme pre-empts the more general tort recovery statutes." Brown, 425 U.S. at 835. Moreover, the fact that a

16

federal employee would be able to circumvent the rigorous administrative exhaustion requirements of § 2000e-16 by suing the federal government under § 1981 motivated the Court's holding. See id. at 832-33. Significantly, in the present appeal, no sovereign immunity concerns are present, and Jones was not allowed to escape the rigors of exhausting his administrative remedies. Thus, the Court's rationale in Brown is simply inapplicable to the present appeal.

Because we hold the district court possessed subject matter jurisdiction over Jones's ADA claims against the Defendants, we vacate the district court's dismissal of his complaint for lack of subject matter jurisdiction.

III.

Although Jones wins the battle over subject matter jurisdiction, he ultimately loses the war. The district court should have granted the Defendants' motion for summary judgment. The law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability. See Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 n.3 (4th Cir. 1997); Collings v. Longview Fibre Co., 63 F.3d 828, 832-33 (9th Cir. 1995); Despears v. Milwaukee County, 63 F.3d 635, 637 (7th Cir. 1995); Maddox v. University of Tenn., 62 F.3d 843, 846-48 (6th Cir. 1995); cf. Little v. FBI, 1 F.3d 255, 259 (4th Cir. 1993) (finding no liability under the Rehabilitation Act of 1973 when firing for disability related intoxication on duty). Assuming Butts made the alleged discriminatory comments at issue to Postal Service officials and she represented the Defendants in doing so, there is absolutely no evidence to suggest that the Postal Service discharged Jones for any reason other than the fact that he threatened the life of his supervisor. Because the ADA does not require an employer to ignore such egregious misconduct by one of its employees, even if the misconduct was caused by the employee's disability, we remand this case to the district court for entry of judgment in favor of the Defendants.

17

IV.

In conclusion, we vacate the district court's dismissal of Jones's ADA claims against the Defendants and remand for entry of judgment in their favor.**6**

<u>VACATED AND REMANDED</u>
_____
**6** Finding no merit to Jones's motion to strike the Defendants' opposition brief to the EEOC's <u>amicus</u> brief, we deny the motion.

18