Gloria **WALSTED**, Plaintiff,

v.

**WOODBURY COUNTY, IOWA**, Defendant.

#### No. C99–4035–MWB.

United States District Court,
N.D. Iowa,
Western Division.

Sept. 25, 2000.

---

Dennis M. McElwain, Smith & McElwain Law Office, Sioux City, IA, for plaintiff Gloria Walsted.

Douglas L. Phillips, Klass, Stoik, Mugan, Villone, Phillips, Orzechowski, Clausen & LaPierre, Sioux City, IA, for defendant Woodbury County.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ..................................................... 1321
 A. Procedural Background ........................................... 1321
 B. Factual Background .............................................. 1322

II. STANDARDS FOR SUMMARY JUDGMENT ............................... 1324

III. LEGAL ANALYSIS ................................................. 1325
 A. Disability Discrimination Under The ADA ........................ 1325
 1. Analytical framework for ADA claims ......................... 1326
 2. Walsted's disability claim .................................. 1327

 a. *Learning and reading* .........................................1329
 b. *Thinking* ...............................................1329
 c. *Concentrating* ...........................................1330
 d. *Interacting with others* ...................................1330
 3. *Walsted's qualification* .......................................1331
 a. *Reasonableness of Walsted's proposed accommodations* .........1333
 b. *Interactive process* ......................................1334
 4. *Walsted's termination* ........................................1337
 B. *Walsted's State Law Claim* .......................................1342

*IV. CONCLUSION* .............................................1343

This summary judgment motion requires the court to resolve novel and probing questions under the Americans with Disabilities Act as to whether an employer may lawfully discharge an employee, with very limited intellectual ability, for workplace misconduct arguably not understood as improper by the employee.

## I. INTRODUCTION

On May 6, 1999, plaintiff Gloria Walsted filed a complaint against her former employer, defendant Woodbury County, Iowa, seeking damages resulting from her termination on December 7, 1997. In her complaint, Walsted alleges two causes of action: a claim of disability discrimination pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq* and, a similar claim under Iowa Code Chapter 216 *et seq*. Woodbury County answered Walsted's complaint on May 21, 1999, denying Walsted's claims and asserting various defenses.

### A. Procedural Background

On February 25, 2000, Woodbury County filed a Motion for Summary Judgment on both of Walsted's claims. First, in its motion, Woodbury County claims that Walsted is not "disabled" within the meaning of either the ADA, or Chapter 216 of the Iowa Code. Specifically, Woodbury County asserts that Walsted does not have a mental impairment that substantially limits one or more of her major life activities. Second, Woodbury County claims that even if the court were to find that a genuine issue of material fact exists with regard to whether or not Walsted is dis-

abled within the meaning of the ADA, Walsted, nevertheless, cannot establish a *prima facie* case because she was not qualified to perform the essential functions of the job. This is so, because Woodbury County argues that an essential duty of Walsted's job as a custodian required that she be "responsible and accountable for seeing that all papers, documents and belongings remain undisturbed in the respective offices," and having twice been convicted of theft arising out of behavior in the work-place, Walsted cannot demonstrate that she was qualified to perform the essential functions of her job. Moreover, Woodbury County argues that it cannot reasonably accommodate Walsted's inability to perform the essential functions of the job. Third, Woodbury County asserts that Walsted cannot establish that it considered anything other than Walsted's propensity towards theft when it made the decision to discharge.

On June 1, 2000, Walsted resisted Woodbury County's Motion for Summary Judgment, arguing that there are genuine issues of material facts in dispute regarding both of her claims. Specifically, Walsted argues that she has raised genuine issues of material fact regarding whether or not she has a disability, whether or not she was an individual with a disability who, with reasonable accommodation, could perform the essential functions of her job, and whether or not Woodbury County discriminated against her in discharging her from her employment.

On August 25, 2000, the court heard oral arguments on Woodbury County's Motion for Summary Judgment. Plaintiff Walsted

was represented by Dennis M. McElwain of Smith & McElwain Law Office, Sioux City, Iowa. Defendant Woodbury County was represented by Douglas L. Phillips of Klass, Stoik, Mugan, Villone, Phillips, Orzechowski, Clausen & LaPierre, Sioux City, Iowa. Before discussing the standards for Woodbury County's Motion for Summary Judgment, however, the court will first examine the factual background of this case.

## B. Factual Background

The summary judgment record reveals that the following facts are undisputed. Walsted is fifty-three years old and has a kindergarten education. She has a full scale IQ score of 73, which places her in the fourth percentile. This means that approximately 96 out of 100 people taking such a standardized test would score higher than Walsted. This full scale IQ score places Walsted in the borderline mentally retarded range. She has a kindergarten level reading ability,[1] first grade level spelling ability, and a second grade level arithmetic ability. Walsted's mental abilities were known to her supervisors and co-workers while she was employed with Woodbury County.

Woodbury County hired Gloria Walsted on October 3, 1989, to work as a custodian in Woodbury County's Building Services Department ("Building Services"). Building Services is responsible for the care and maintenance of the County's buildings. From the beginning of her employment with Woodbury County in 1989, through 1995, Walsted was usually assigned to custodial positions that included work with other custodians. She was responsible for general office cleaning, and maintaining restroom supplies. However, she was never required to read labels of cleansers or mix chemicals used for cleaning.

In October of 1995, Mark Elgert became the building superintendent. Elgert had no training in reference to working with disabled employees or the ADA. Elgert's duties included supervision of Walsted and the other custodians employed by the County. Shortly after Elgert became building superintendent, a co-worker of Walsted's, Linda Hendricks, reported that her wallet was missing. An investigation ensued, after which Walsted admitted that she had hidden Hendricks's wallet. Walsted stated that she wanted to play a trick on Hendricks, with whom she had worked since her employment with the County began, by hiding her wallet. Walsted was charged with Theft in the Fifth Degree, in violation of Iowa Code §§ 714.1 and 714.2(5). Following a bench trial, Walsted was convicted of these charges. The trial court issued the following findings of fact:

One night of October 19, 1995, Defendant [Walsted] was at work with Linda Hendricks and others. During the course of the night Defendant removed Linda Hendricks' wallet from her purse and hid it. After Linda Hendricks left work she noticed her wallet was missing. The next morning the missing wallet was reported to the Woodbury County Sheriff. The next night at work Defendant was made aware of the concern of Linda Hendricks about her missing wallet and the fact that it had been reported as stolen.

On October 25, 1995, Defendant was interviewed by Deputy Haafke regarding the wallet and after being advised of her rights admitted she "stole" it. She then took Deputy Haafke and Mark Elgert, her and Linda Hendricks' supervisor, to the location where she had hidden it.

Defendant was charged with Theft in the Fifth Degree, in violation of Iowa Code Sections 714.1 and 714.2(5) and

---

1. Walsted asserts that she suffers from Dyslexia. Dyslexia is defined as: "[i]ncomplete alexia; a level of reading ability markedly below that expected on the basis of the individual's level of over-all intelligence or ability

in skills." STEDMAN'S MEDICAL DICTIONARY 477 (25th ed.1990). However, there is no evidence in the record before the court that Walsted suffers from Dyslexia, other than her own allegation.

asserts that her actions were in the form of a prank or practical joke and that she did not intend to keep the wallet or its contents and in support thereof points to the fact that the wallet was never removed from the work site although ample opportunity existed to do so.

*See* Findings, Conclusions and Judgment, No. SM376916, Iowa District Court for Woodbury County, July 18, 1996. For this conduct, Walsted was suspended without pay from work and referred to Woodbury County's Employee Assistance Program. Additionally, Mark Elgert provided Walsted with a memo explaining what his expectations were of Walsted's future conduct at work.[2] Elgert also personally explained this memo to Walsted. Thereafter, Walsted returned to work.

When Elgert became building superintendent, custodians were assigned new routes among the three County buildings for which they were responsible. For Walsted, this meant transferring from the Trosper–Hoyt building to the Woodbury County Courthouse, where she was assigned to the evening shift in the basement of the County Courthouse. Walsted's new work area was primarily the Department of Motor Vehicles. Upon her transfer to this new area, Walsted was not provided with further training or orientation with reference to this work area. Walsted was not given any orientation as to the value of automobile registration validation stickers or other items located in the Department of Motor Vehicles.

In November of 1997, the Woodbury County Sheriff's Office received a complaint from the Woodbury County Treasurer regarding the theft of automobile registration validation stickers from the Department of Motor Vehicles, which was located in the basement of the Woodbury County Courthouse. Woodbury County Sheriff Deputy David Kjos was assigned to investigate the matter. On November 30, 1997, Deputy Kjos set up videotape surveillance in the basement of the Woodbury County Courthouse. The surveillance video tape showed Walsted removing automobile validation stickers on December 10, 1997, and again on December 12, 1997.

On December 17, 1997, Deputy Kjos arrested Walsted for the theft of the automobile validation stickers. After her arrest, Walsted was interviewed by Deputy Kjos. During this interview, Walsted admitted that she pulled stickers off the desk area where she worked, and would place the stickers on paper or boxes that were in the garbage. Walsted told Deputy Kjos that when she was bored at work she practiced wrapping boxes and used the stickers as decorations to seal packages that she made. Walsted stated that she did not take the stickers to sell to others, for profit or for personal gain. Notwithstanding, Walsted was subsequently charged with Theft in the Fifth degree. On July 13, 1998, a finding of guilt was entered against Walsted.

On December 17, 1997, Elgert gave Walsted written notice of her employment termination. Elgert wrote that Walsted's employment was being terminated "for stealing property within the Motor Vehicle Department which is also property of the State of Iowa." The Woodbury County Employee Handbook contains a provision that provides that employees convicted of committing criminal acts involving moral turpitude are subject to discipline.

At the time of her termination, Walsted had worked for Woodbury County for more than eight years, where she had performed her job duties satisfactorily and demonstrated good work attitude and enthusiasm for her position. Since her termination, Walsted has been employed as a motel housekeeper.

---

**2.** Elgert's 1995 memorandum does not appear in the summary judgment record before the court.

## II. STANDARDS FOR SUMMARY JUDGMENT

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R.CIV.P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon. ... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact*

*and that the moving party is entitled to judgment as a matter of law.*

FED.R.CIV.P. 56(a)–(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same); *Rifkin v. McDonnell Douglas Corp.,* 78 F.3d 1277, 1280 (8th Cir.1996); *Marts v. Xerox, Inc.,* 77 F.3d 1109, 1112 (8th Cir.1996); *Munz,* 28 F.3d at 796; *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994);

Johnson v. Group Health Plan, Inc., 994 F.2d 543, 545 (8th Cir.1993); Burk v. Beene, 948 F.2d 489, 492 (8th Cir.1991); Coday v. City of Springfield, 939 F.2d 666, 667 (8th Cir.1991), cert. denied, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Because this is an employment discrimination case, it is well to remember that the Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir.1994) (citing Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir.1991); Hillebrand v. M–Tron Indus., Inc., 827 F.2d 363, 364 (8th Cir.1987), cert. denied, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); see also Snow v. Ridgeview Medical Ctr., 128 F.3d 1201, 1205 (8th Cir.1997) (citing Crawford ); Helfter v. United Parcel Serv., Inc., 115 F.3d 613, 615 (8th Cir. 1997) (quoting Crawford ); Chock v. Northwest Airlines, Inc., 113 F.3d 861, 862 (8th Cir.1997) ("We must also keep in mind, as our court has previously cautioned, that summary judgment should be used sparingly in employment discrimination cases," citing Crawford ); Smith v. St. Louis Univ., 109 F.3d 1261, 1264 (8th Cir. 1997) (quoting Crawford ); Hardin v. Hussmann Corp., 45 F.3d 262 (8th Cir. 1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing Haglof v. Northwest Rehabilitation, Inc., 910 F.2d 492, 495 (8th Cir.1990); Hillebrand, 827 F.2d at 364). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." Johnson, 931 F.2d at 1244; see also Webb v. St. Louis Post–Dispatch, 51 F.3d 147, 148 (8th Cir.1995) (quoting Johnson, 931 F.2d at 1244); Crawford, 37 F.3d at 1341 (quoting Johnson, 931 F.2d at 1244). To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." Crawford, 37 F.3d at 1341 (holding that there was a genuine issue of material fact precluding summary judgment); accord Snow, 128 F.3d at 1205 ("Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nomnovant," citing Crawford ); Webb v. Garelick Mfg. Co., 94 F.3d 484, 486 (8th Cir.1996) (citing Crawford, 37 F.3d at 1341); Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir.1995) (quoting Crawford, 37 F.3d at 1341); Johnson, 931 F.2d at 1244. With these standards in mind, the court turns to consideration of Woodbury County's motion for summary judgment.

### III. LEGAL ANALYSIS

Walsted has brought her disability discrimination claims under both federal and state law. Her federal disability discrimination claim is based on the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq. Her state-law disability discrimination claim is brought pursuant to Iowa Code Chapter 216. The court will consider Walsted's federal claim first and then turn to Walsted's state-law claim.

#### A. Disability Discrimination Under The ADA

Under the ADA, "disability" is broadly defined to include not only "a physical or mental impairment that substantially limits one or more of the major life activities of [the disabled] individual," but also covers persons "ha[ving] a record of such an impairment," or those "being regarded as having such an impairment." 42 U.S.C. §§ 12102(2)(A), (B), (C); Bragdon v. Abbott, 524 U.S. 624, 118 S.Ct. 2196, 2201, 141 L.Ed.2d 540 (1998); Taylor v. Nimock's Oil Co., 214 F.3d 957, 959 (8th Cir.2000); Fjellestad v. Pizza Hut of Am., 188 F.3d 944 (8th Cir.1999); Webb v. Garelick Mfg. Co., 94 F.3d 484, 487 (8th Cir.1996); Aucutt v. Six Flags Over Mid–Am., Inc., 85

F.3d 1311, 1318 (8th Cir.1996); *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995).

The Eighth Circuit Court of Appeals has observed that "[t]he purpose of the ADA is broad and remedial: It is designed to provide 'a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Webb*, 94 F.3d at 487 (quoting 42 U.S.C. § 12101(b)(1)); *accord Kornblau v. Dade County*, 86 F.3d 193, 194 (11th Cir.1996). This court has previously engaged in extensive discussions of the origins of the ADA, and therefore, it will not do so again here. *See Muller v. Hotsy Corp.*, 917 F.Supp. 1389, 1402–05 (N.D.Iowa 1996); *Heather K. v. City of Mallard, Iowa*, 887 F.Supp. 1249, 1263–66 (N.D.Iowa 1995); *Hutchinson v. United Parcel Serv., Inc.*, 883 F.Supp. 379, 387–90 (N.D.Iowa 1995); *Fink v. Kitzman*, 881 F.Supp. 1347, 1368–71 (N.D.Iowa 1995); *Valentine v. American Home Shield Corp.*, 939 F.Supp. 1376, 1388–91 (N.D.Iowa 1996). Instead, the court will first briefly set forth the analytical framework for determining claims under the ADA, and then address the nature of the prohibition on disability discrimination found in the ADA.

### 1. Analytical framework for ADA claims

■ To qualify for relief under the ADA, a plaintiff must establish the following: (1) that he or she is a disabled person within the meaning of the ADA; (2) that he or she is qualified, that is, with or without reasonable accommodation (which the plaintiff must describe), he or she is able to perform the essential functions of the job; and (3) that the employer terminated the plaintiff, or subjected the employee to adverse an decision, "because of" the plaintiff's disability.[3] *See Treanor v. MCI Telecomm. Corp.*, 200 F.3d 570, 574 (8th Cir.2000); *Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1016 (8th Cir.2000); *Buckles v. First Data Resources, Inc.*, 176 F.3d 1098, 1100 (8th Cir.1999); *Fjellestad*, 188 F.3d at 948; *Weber v. Strippit, Inc.*, 186 F.3d 907, 912 (8th Cir.1999); *Smith v. City of Des Moines*, 99 F.3d 1466, 1473 (8th Cir.1996); *Price v. S–B Power Tool*, 75 F.3d 362, 364 (8th Cir.1996); *Benson v. Northwest Airlines*, 62 F.3d 1108, 1112 (8th Cir.1995); *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995).

If a plaintiff in an ADA employment discrimination case can establish these three elements, then the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Taylor*, 214 F.3d at 959; *Allen v. Interior Const. Servs., Ltd.*, 214 F.3d 978, 981 (8th Cir. 2000); *Floyd v. Missouri Dept. of Soc. Servs.*, 188 F.3d 932, 936 (8th Cir.1999); *Young v. Warner–Jenkinson Co.*, 152 F.3d 1018, 1021 (8th Cir.1998). Once such a reason is proffered, the burden shifts back to the plaintiff to show that the employer's

---

**3.** The court notes that some federal appellate courts have concluded that in ADA cases where the central issue is whether the employer should have reasonably accommodated the employee's disability but did not, the *McDonnell Douglas* analysis is inappropriate. *Lenker v. Methodist Hosp.*, 210 F.3d 792, 799 (7th Cir.2000); *Bultemeyer v. Fort Wayne Community Schs.*, 100 F.3d 1281, 1283–84 (7th Cir.1996); *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996) *see also Montgomery v. John Deere & Co.*, 169 F.3d 556, 561 (8th Cir.1999) (Lay, J., concurring); *Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1219 (8th Cir.1999) (Lay, J., dissenting); *see generally* Kevin W. Williams, *The Reasonable Accommodation Difference: The Effect of Applying the Burden Shifting Frameworks Developed under Title VII in Disparate Treatment Cases to Claims Brought under Title I of the Americans with Disabilities Act*, 18 BERKELEY J. EMP. & LAB. L. 98, 151–59 (1997). Although this approach is appealing in its clarity and simplicity, the Eighth Circuit Court of Appeals has yet to approve of its application in such ADA cases. Therefore, being bound by Eighth Circuit precedent, the court will apply the *McDonnell Douglas* analysis here.

stated reason is pre-textual.[4] *See id.* at 804, 93 S.Ct. 1817; *Allen*, 214 F.3d at 981; *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir.1999) (en banc). In this case, the two fighting issues are whether Walsted is "disabled" within the meaning of the ADA, and if disabled, was Walsted an individual who, with or without reasonable accommodation, could perform the essential functions of her employment position.

Walsted claims that she is disabled because her mental impairment "substantially limits" major life activities. The court, therefore, will first address first Walsted's claim under § 12102(2)(A) that she is disabled because her mental impairment "substantially limits" major life activities.

#### 2. *Walsted's disability claim*

Walsted claims that she is actually disabled under the ADA. Consequently, the court must determine whether Walsted has a present physical or mental impairment[5] that substantially limits one or more of her major life activities. 42 U.S.C. § 12102(2)(A); *see Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S.Ct. 2139, 2146, 144 L.Ed.2d 450 (1999) (requiring that a person be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability). In seeking further definition of the term "substantially limits" under the ADA, the Eighth Circuit Court of Appeals looks to the regulations implementing the ADA:

> Several factors are considered in determining whether a person is substantially limited in a major life activity: (1) the nature and severity of the impairment; (2) its duration or anticipated duration; and (3) its long-term impact. 29 C.F.R. § 1630.2(j)(2)(i)–(iii).

*Taylor*, 214 F.3d 957, 959; *accord Aucutt*, 85 F.3d at 1319 ("[T]he EEOC regulations state that the following factors should be considered in determining whether an individual is substantially limited in a major life activity: (i) the nature and severity of the impairment, (ii) its duration or expected duration, and (iii) its actual or expected long-term impact. 29 C.F.R. § 1630.2(j)(2)."); *Cook v. State of R.I. Dep't of Mental Health, Retardation, & Hosps.*, 10 F.3d 17, 25 n. 10 (1st Cir.1993) (finding that EEOC regulations "indicate that the question of whether an impairment is substantially limiting turns on '(1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the [actual or expected] permanent or long-term impact ... of, or resulting from, the impairment,'" quoting 29 C.F.R. § 1630 app. at 403 (1992)). Moreover, the United States Supreme Court has held that the determination of whether an individual is substantially limited in a major life activity must take into account mitigating measures such as medicines and assistive devices. *Sutton*, 119 S.Ct. at 2147; *Taylor*, 214 F.3d 957, 959

This court has applied this "substantially limits" a "major life activity" requirement in a number of cases under the ADA. *See, e.g., Wheaton v. Ogden Newspapers, Inc.*, 66 F.Supp.2d 1053, 1061–65 (N.D.Iowa 1999) (considering whether the plaintiff's back condition substantially limits any major life activities such that the plaintiff was disabled within the meaning of the ADA); *Muller*, 917 F.Supp. at 1411–12 (considering whether a person with a temporary spinal injury was nonetheless perceived by his employer as having a disability that substantially limited his major life activity

---

**4.** This court, in *Mercer v. City of Cedar Rapids*, 104 F.Supp.2d 1130 (N.D.Iowa 2000), discussed the affect that the Supreme Court's decision in *Reeves v. Sanderson Plumbing Prods., Inc.*, —— U.S. ——, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) had on the *McDonnell–Douglas* burden shifting analysis, namely, the demise of the "pretext-plus" test.

**5.** Mental impairment is further defined by EEOC regulations as "any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness and specific learning disabilities." 29 C.F.R. § 1630.2(h).

of working); *Hutchinson,* 883 F.Supp. at 395–96 (considering whether a person with shoulder and back injuries was substantially limited in any major life activity); *Fink,* 881 F.Supp. at 1376–77 (considering whether a person with carpal tunnel syndrome was substantially limited in a major life activity).

Since the ADA does not define "major life activities," the Eighth Circuit Court of Appeals has been guided by the definition provided in 29 C.F.R. § 1630.2 of the EEOC regulations on implementation of Title I of the ADA. *Aucutt,* 85 F.3d at 1319. As the court observed in *Aucutt:*

> As defined in 29 C.F.R. § 1630.2(I), the phrase "major life activities" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

*Aucutt,* 85 F.3d at 1319; *accord Weber,* 186 F.3d at 912. Under the EEOC's interpretations of the ADA,

> "Major life activities" are those basic activities that the average person in the general population can perform with little or no difficulty. Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. This list is not exhaustive. For example, other major life activities include, but are not limited to, sitting, standing, lifting, reaching.

29 C.F.R. § 1630.2(I); *see also Bragdon,* 118 S.Ct. at 2204 (emphasizing that the regulations provide an illustration, rather than exhaustive, list of major activities) The Eighth Circuit Court of Appeals has also considered major life activities to include, sitting, standing, lifting, and reaching. *Fjellestad,* 188 F.3d at 948; *accord Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 616 (8th Cir.1997).

This court has previously analyzed whether certain alleged disabilities met the requirements ·of substantially limiting the plaintiff in a major life activity. *See, e.g.,*

*Wheaton,* 66 F.Supp.2d at 1061–64 (the plaintiff generated genuine issues of material fact precluding summary judgment as to whether she was substantially limited in the major life activities of lifting, standing, and working because of her back condition); *Muller,* 917 F.Supp. at 1412 (in a perceived disability case, the plaintiff generated a genuine issue of material fact precluding summary judgment as to whether his employer perceived him to be substantially limited in the major life activity of working because of his back injuries); *Hutchinson,* 883 F.Supp. at 395–96 (back and shoulder injuries were not minor, but were temporary, and any remaining impairment was admittedly only slight, thus plaintiff was not disqualified from a wide range of jobs, and had failed to demonstrate substantial limitations in any other major life activity); *Fink,* 881 F.Supp. at 1376–77 (plaintiff with carpal tunnel syndrome was restricted only in lifting, but was not substantially limited in any other way, and the lifting restriction did not substantially limit any major life activity or even impair plaintiff's job performance); *Schwarz v. Northwest Iowa Community College,* 881 F.Supp. 1323, 1343–45 (N.D.Iowa 1995) (applying Iowa disability discrimination law, the court held that alleged "night blindness," although it impaired the major life activity of seeing, did not limit the plaintiff in any significant way from obtaining satisfactory employment or disqualify her from a wide range of jobs). Here, the parties dispute whether or not Walsted's mental impairment constitutes a disability within the meaning of the ADA. Walsted asserts that her mental impairment substantially limits the following major life activities: (1) reading; (2)learning; (3) thinking; (4) concentrating; (5) interacting with others; and (6) working. Thus, the court must determine whether Walsted has generated a genuine issue of material fact as to whether her mental impairment substantially limits one or more of her major life activities, or whether Woodbury County is entitled to sum-

mary judgment on the ground that Walsted is not disabled within the meaning of the ADA.

#### a. Learning and reading

Walsted asserts that her mental impairment substantially limits the major life activities of learning and reading. Walsted presented evidence illustrating specific circumstances where she encountered substantial difficulty in learning and reading. *See Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir.1999) (noting that learning was a major life activity within the meaning of the ADA); *Gonzales v. Nat'l Board of Medical Examiners*, 2000 WL 1179798, *5 (6th Cir. August 22, 2000) (analyzing reading as a major life activity within the meaning of the ADA). In Walsted's deposition, she asserted that she had trouble keeping up with the other children in school and that, notwithstanding taking literacy classes, she is only able to write her name, address, and a few "simple" words. Walsted Dep. at ¶ 2. Her reading ability is similarly limited, permitting her only to read a few words she has learned. Walsted Dep. at ¶ 2. Walsted also relates that she has difficulty learning job duties and rules as quickly as her fellow workers. Walsted Dep. at ¶ 2. Walsted introduced the psychological evaluation performed on her by Denise Marandola, in which Dr. Marandola concludes that Walsted's full scale IQ is 73, which places her in the fourth percentile. *See* Marandola Report at p. 2. This means that approximately 96 out of 100 people taking such a standardized test would score higher than Walsted. *Id.* This full scale IQ score, moreover, places her in the borderline mentally retarded range. *Id.* Dr. Marandola also noted that Walsted's achievement scores, which demonstrate that Walsted has a kindergarten level reading ability, a first grade level spelling ability, and a second grade arithmetic ability, suggest that she is probably learning disabled. *Id.* at 3.

On the record before it, the court concludes that Walsted has generated a genuine issue of material fact as to whether her mental impairment substantially limits the major life activities of learning and reading. 29 C.F.R. ¶ 1630.2(I). The Equal Employment Opportunity Commission's Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. ¶ 1630.2(j), provides:

> [A]n impairment is substantially limiting if it significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity as compared to the average person in the general population's ability to perform that same major life activity. Thus, for example, an individual who, because of an impairment, can only walk for very brief periods of time would be substantially limited in the major life activity of walking.

29 C.F.R. § 1630.2(j). In light of all the evidence, the court concludes that Walsted has generated a genuine issue of material fact that she is significantly restricted, as compared to an average person in the general population, as to the duration, manner and condition under which she can conduct the "major life activities" of learning and reading. *See Bowen v. Income Producing Management, Inc.*, 202 F.3d 1282, 1287–88 (10th Cir.2000) (recognizing that, to be significantly restricted in learning, one's skills and abilities must be inferior to those of the average person). Therefore, a material fact questions exists as to whether Walsted is substantially limited in the major life activities of reading and learning.

#### b. Thinking

The court next considers the evidence put forward by Walsted to support her claim that she was substantially limited in her ability to think. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3rd Cir.1999) (recognizing thinking as a major life activity). As the Third Circuit Court of Appeals aptly recognized in *Taylor*: "We hardly need to point out that thinking

is inescapably central to anyone's life." *Id.* The allegations relating to Walsted's ability to think are much the same as those that related to Walsted's ability to learn and read. In addition, Walsted generally alleged in her deposition that she experienced difficulty thinking "as quick as other workers." Walsted Dep. ¶ 3. Dr. Marandola reports that Walsted "has very concrete and simplistic thinking." Marandola Rep. at p. 3. The court is persuaded that Walsted has produced evidence sufficient to create a genuine issue of material fact as to whether she is substantially limited in the major life activity of thinking.

### c. Concentrating

Next, the court will consider the evidence set forth by Walsted to support her claim that she was substantially limited in the major life activity of concentrating. *See* EEOC Compliance Manual § 902.3(b) (listing concentrating as major life activity); *But see Pack v. Kmart Corp.,* 166 F.3d 1300, 1305 (10th Cir.1999) (concluding that concentrating is not a major life activity within the meaning of the ADA). The allegations relating to Walsted's ability to concentrate are again much the same as those related to Walsted's ability to learn, read, and think. In addition to these previously discussed allegations, Walsted alleges in her deposition that she "cannot often concentrate on a problem long enough to figure it out." Walsted Dep. ¶ 3. Given the record regarding Walsted's general mental abilities, the court is persuaded that Walsted has introduced evidence sufficient to create a genuine issue of material fact as to whether she is substantially limited in the major life activity of concentrating.

### d. Interacting with others

Walsted introduced no evidence relevant to her contention that she was substantially limited in her ability to interact with others. *See McAlindin v. County of San Diego,* 192 F.3d 1226, 1234 (9th Cir.1999) (noting that "[b]ecause interacting with others is an essential, regular function, like walking and breathing, it easily falls within the definition of 'major life activity.' "), *amended by* 201 F.3d 1211 (9th Cir.2000), *cert. denied,* — U.S. ——, 120 S.Ct. 2689, 147 L.Ed.2d 961 (2000). *But see Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 15 (1st Cir.1997) (noting that the "ability to get along with others" was too vague to be a major life activity, but acknowledged that "a more narrowly defined concept going to essential attributes of human communication could, in a particular setting, be understood to be a major life activity."). Walsted's evidence on this issue is insufficient to demonstrate that she was significantly restricted in her ability to interact with others relative to the average person in the general population. *See McAlindin,* 192 F.3d at 1235 (holding that interacting with others is a major life activity and that, in order to show a substantial limitation, " 'a plaintiff must show that his relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary' ") (quoting EEOC Guidance on Psychiatric Disabilities and the Americans with Disabilities Act at E–4 (1997)). Therefore, finding that no genuine issue of material fact exists as to whether Walsted is substantially limited in the major life activity of interacting with others, this portion of Woodbury County's Motion for Summary Judgment is granted.

Having concluded that Walsted generated a genuine issue of material fact as to whether she is substantially limited with respect to the major life activities of learning, reading, thinking, and concentrating, the court need not, and, thus, will not, determine whether Walsted is substantially limited in the major life activity of working. *See* 29 C.F.R. § 1630.2(j) ("If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered. If an individual is substantially lim-

ited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working.").

### 3. *Walsted's qualification*

Having concluded that Walsted has generated a genuine issue of material fact as to whether she has an actual disability under the ADA, the court proceeds to examine whether Walsted has generated a genuine issue of material fact as to whether she is "a qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *See* 42 U.S.C. § 12111(8); *Fjellestad,* 188 F.3d at 950; *Wilking v. County of Ramsey,* 153 F.3d 869, 873 (8th Cir.1998) (quotation omitted); *Benson,* 62 F.3d at 1111–12. To be considered a qualified individual, Walsted must (1) possess the requisite skill, education, experience, training for the position; and (2) be able to perform the essential job functions, with or without reasonable accommodation. *See* 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m); *Cravens,* 214 F.3d at 1016 (stating that the determination of qualification involves a two-fold inquiry: (1) whether the individual meets the necessary prerequisites for the job such as experience, education, training and the like; and (2) whether the individual can perform the essential job functions, with or without reasonable accommodation); *see also Weber,* 186 F.3d at 916.; *Moritz v. Frontier Airlines, Inc.,* 147 F.3d 784, 787 (8th Cir. 1998); *Benson,* 62 F.3d at 1111–12. Although Walsted retains the burden of persuading the trier of fact that she has been the victim of illegal disability discrimination, "once [Walsted] makes a 'facial showing that reasonable accommodation is possible,' the burden of production shifts to [Woodbury County] to show that it is unable to accommodate [Walsted]." *Cravens,* 214 F.3d at 1016 (citations omitted).

Woodbury County argues that Walsted was not qualified to perform the essential functions of the job, with or without reasonable accommodation. Woodbury contends this is so because one of the essential duties of her former job as a custodian includes being "responsible and accountable for seeing that all papers, documents and belongings remain undisturbed in the respective offices." Defendant's Brief at 7. Because Walsted was twice convicted of theft arising out of behavior in the workplace, the first time in 1996 when Walsted was convicted of stealing a wallet from another county employee, and the second time in 1998 when Walsted was convicted of stealing license plate stickers from the Department of Motor Vehicles, Woodbury County argues that she cannot demonstrate that she was qualified to perform the essential functions of her job.

Furthermore, Woodbury County asserts that it cannot reasonably accommodate Walsted's inability to perform the essential functions of the job. In support of this assertion, Woodbury County points out that, after Walsted's first conviction for stealing from the work-place, not only was Walsted sent a detailed memo explaining Woodbury County's "expectations," but each item in the memo was personally explained to Walsted by her supervisor, Mark Elgert. Woodbury County also points out that Walsted was referred to its Employee Assistance Program, where she could gain additional insight into her problem with taking things from people. Woodbury County argues that these accommodations were afforded to Walsted in vain, because Walsted was stealing again two years later. Thus, Woodbury County argues that having failed in its early efforts to educate Walsted about the problems with her behavior, it is not required to eliminate essential functions of the job, assign someone to watch her, or hire additional staff to make sure she doesn't take anything else. Woodbury County asserts that the duty of reasonable accommodation does not extend that far.

In response to Woodbury County's argument, Walsted argues that her eight years of satisfactory employment as a custodian demonstrate that she is qualified to perform the essential functions of this job, and that with the reasonable accommodation of periodic instruction or training she would continue to be qualified to perform the essential functions of her job. Specifically, Walsted asserts that Woodbury County could have provided better supervision so that she would understand the importance of documents and items, including the license stickers located in the area in which she worked. In the alternative, Walsted argues that she should have been assigned to a different work area, closer in proximity to fellow custodians, as she had been in her first six years of employment with Woodbury County.

As indicated above, determining whether or not Walsted is a qualified individual under the ADA requires a two-fold inquiry: (1) whether the individual meets the necessary prerequisites for the job such as experience, education, training and the like; and (2) whether the individual can perform the essential job functions, with or without reasonable accommodation. *Cravens*, 214 F.3d at 1016. It is undisputed that, with the exception of the two incidents of theft, Walsted performed satisfactorily in her employment with Woodbury County as a custodian for more than eight years, receiving periodic pay raises. In fact, upon reviewing Walsted's work evaluations that were submitted to the court by Woodbury County, spanning from 1990–1993, Walsted's supervisor consistently lauded her attitude and the enthusiasm she displayed towards work. Even Mark Elgert, the supervisor who was responsible for Walsted's termination, stated in an affi-

davit that Walsted performed in a generally acceptable fashion. *Cf. Mole*, 165 F.3d 1212 at 1217 ("An ADA plaintiff may not rely upon past performance to establish that she is a qualified individual without accommodation when the employer has produced undisputed evidence of diminished or deteriorated abilities."). Thus, the court concludes that Walsted has generated a genuine issue of material fact as to whether she meets the first element of qualification—that is, whether she meets the necessary prerequisites for the job such as experience, education, training and the like. *See Cravens*, 214 F.3d at 1016.

The inquiry, therefore, hinges on whether or not Walsted has generated a genuine issue of material fact as to whether she was able to perform the essential functions[6] of her job with or without reasonable accommodation. Walsted does not take issue with Woodbury County's assertion that being "responsible and accountable for seeing that all papers, documents and belongings remain undisturbed in the respective offices," is an essential function of the job of a custodian. *See* 42 U.S.C. § 12111(8) (stating that consideration shall be given to the employer's judgment as to what functions of the job are essential). She argues, however, that with a reasonable accommodation she could continue to be qualified to perform the essential functions of her job. Walsted contends that Woodbury County could have reasonably accommodated her in either of the following two ways: (1) periodic training or instruction in basic work rules; or, in the alternative, (2) transfer to another area. Because Woodbury County failed to provide either of these accommodations, which Walsted contends are reasonable, she ar-

---

**6.** An essential function "means the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." *Moritz*, 147 F.3d at 787; 29 C.F.R. § 1630.2(n)(1). An essential function may be established by evidence that includes: (1) "[t]he employer's judgment as to which func-

tions are essential"; (2) "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job"; (3) "the amount of time spent on the job performing the function"; (4) "the consequences of not requiring the incumbent to perform the function"; and (5) "the current work experience of incumbents in similar jobs." *Moritz*, 147 F.3d at 787 (citing 29 C.F.R. § 1630.2(n)(3)).

gues that Woodbury County violated the ADA.

### a. *Reasonableness of Walsted's proposed accommodations*

The Eighth Circuit Court of Appeals has stated the following regarding the reasonableness of an accommodation an employer must make:

> There is no precise test for what constitutes a reasonable accommodation, but an accommodation is unreasonable if it "either imposed undue financial or administrative burdens, or requires a fundamental alteration in the nature of the program." *DeBord v. Board of Educ.*, 126 F.3d 1102, 1106 (8th Cir.1997).

*Buckles v. First Data Resources, Inc.*, 176 F.3d 1098, 1101 (8th Cir.1999). Woodbury County argues that it accommodated Walsted after the first incident of theft, and that because its efforts in educating Walsted about her behavior failed, as evidenced by her subsequent theft, it was not obligated to accommodate her a second time. The court, however, is not persuaded that the first accommodation provided to Walsted effectively eliminates Woodbury County's obligation to provide Walsted with a second accommodation before terminating her. *See Weber,* 186 F.3d at 916 (stating that where an employee suffers from an actual disability (i.e., an impairment that substantially limits a major life activity), the employer cannot terminate the employee on account of the disability without first making reasonable accommodations that would enable the employee to continue performing the essential functions of his job). This is so because the court does not know the contents of the memo that was sent and explained to Walsted after the first incident of theft. Indeed, in its brief, Woodbury County states:

> "[T]he County sent her a detailed memo explaining its expectations. Each item in the memo was explained personally to Plaintiff by her supervisor, Mark Elgert. In addition, the County referred Plain-

tiff to its Employee Assistance Program, where she could gain additional insight into the problem with taking things from people."

Defendant Brief at 7. However, a copy of the purported memo is not a part of the summary judgment record. Moreover, the fact that Woodbury County merely referred Walsted to its Employee Assistance Program ("EAP") is clearly an insufficient and unreasonable accommodation. There is no evidence in the summary judgment record that she actually attended the EAP or that the EAP could have provided her with any meaningful counseling in light of her kindergarten education and her IQ. Given Walsted's substantially limited mental abilities, it was patently unreasonable for Woodbury County to have expected Walsted to avail herself of the EAP referral without more specific action by Woodbury County in assisting Walsted in setting up and following through on an appointment. Moreover, there is no showing in the summary judgment record that Woodbury County's EAP was in a position to counsel Walsted about her situation. Indeed, *Woodbury County's* referral of Walsted to the EAP is the functional equivalent of a school nurse telling a kindergartner that they need to see a pediatric endocrinologist and expecting the kindergartner to make and attend such an appointment, and to comprehend and report back to the school nurse what the endocrinologist diagnosed. Woodbury County does not claim that additional training or instruction in Walsted's work area would impose undue financial or administrative burdens, or require a fundamental alteration in the nature of the program. *See Buckles,* 176 F.3d at 1101. Rather, as indicated earlier, Woodbury County argues that because it failed in its early efforts to educate Walsted about the problems of her behavior, it is not now required to eliminate essential functions of the job, assign someone to watch Walsted, or hire addi-

tional staff to make sure she doesn't take anything else. The court agrees that these accommodations, if requested, are unreasonable. 42 U.S.C. §§ 12112(b)(5)(A), 12111(10); *see Moritz,* 147 F.3d 784, 788 (8th Cir.1998) (stating that reallocating the essential functions of a position, eliminating the essential functions of a position, hiring additional employees or reassigning existing workers to assist the ADA plaintiff in her duties are not reasonable accommodations under the ADA). Significantly, however, Walsted does not request any one of these accommodations. Rather, Walsted primarily requests special training or instruction. The court concludes that this accommodation, particularly in light of Walsted's kindergarten education and borderline mentally retarded IQ, is reasonable. *See Kells v. Sinclair Buick—GMC Truck, Inc.,* 210 F.3d 827, 833 (8th Cir.2000) (citing 42 U.S.C. § 12111(9)(B) (explaining that reasonable accommodations might include, *inter alia,* special training)). Indeed, the fact that Walsted satisfactorily performed her duties as a custodian for over eight years creates a fact question as to whether she was qualified for this position with periodic training and instruction and whether periodic training and instruction would be a reasonable accommodation. The court, however, does not find that Walsted's alternative accommodation request, namely, transfer to another area, is reasonable.

Therefore, because Walsted has made a facial showing that the reasonable accommodation of periodic training and instruction was possible, the burden shifts to Woodbury County to prove that it is unable to accommodate Walsted through periodic training and instruction. *See Fjellestad,* 188 F.3d at 951 (citing *Benson,* 62 F.3d at 1115). Woodbury County offered no evidence that Walsted would be unable to perform the essential functions of the job as a custodian with periodic training and instruction. Additionally, Woodbury County failed to present any evidence indi-

cating that the accommodation sought by Walsted would impose an undue financial and administrative burden on Woodbury County.

### b. Interactive process

■ The Eighth Circuit Court of Appeals in *Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944 (8th Cir.1999) stated:

> An employer commits unlawful discrimination under the ADA if the employer does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employer] with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. 29 C.F.R. § 1630.2(*o*)(3).

*Fjellestad,* 188 F.3d at 951–52. Furthermore, the Eighth Circuit Court of Appeals has held that, although there is no per se liability under the ADA if an employer fails to engage in an interactive process, for the purposes of summary judgment:

> the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith. *Fjellestad,* 188 F.3d at 952.

*Cravens,* 214 F.3d at 1020. To establish that an employer failed to participate in an interactive process, a disabled employee must show: (1) the employer knew about the employee's disability; (2) the employee

requested accommodation or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodation; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *Id.* (citing *Fjellestad*, 188 F.3d at 952).

Applying this analysis here, the court finds that Walsted has created a genuine issue of material fact about whether Woodbury County failed to participate in the interactive process. First, Woodbury County had more than enough information to put it on notice that Walsted might have a disability. In her affidavit, Walsted stated that she had three different supervisors while employed at Woodbury County. Affidavit of Walsted ¶ 6. She stated that her first two supervisors, namely Bob Carlson and Lee Townsend, knew that she needed extra training to learn the jobs that she performed at the different County buildings. Affidavit of Walsted ¶¶ 6, 7. Walsted also stated that while working under the supervision of Carlson and continuing until her discharge, she began taking reading classes, and that the County would purchase the books that she needed for this class. *Id.* The evaluations that Walsted received under the supervision of Carlson and Townsend also suggest that Woodbury County had notice that Walsted might have had a disability. For example, on Walsted's Performance Review, dated October 1990, it was noted that "Gloria is improving in this area [knowledge], but still requires extensive training"; "Gloria needs a better understanding of the tools and products in order for her to be effective and more productive"; and that her supervisor "will work with her as time allows." In her October 1991 evaluation, it was noted that "Gloria needs to work to improve in this area [dependability and work habits], the one thing that I can depend on at this time is that Gloria is going to forget something," and that her supervisor will "watch closely and assist anyway possible." In her October 1993 evaluation, the following

regarding Walsted's work was noted: "Supervisors must assist in explaining most written instructions"; "Below average knowledge. Must be given guidance and assistance to follow simple instructions, however, is a dedicated worker that strives to improve"; "Accepts supervision and instructions on work procedures. Cooperates when changes are made to job assignment"; and that her supervisor will "[m]ake sure [Walsted] understand[s] all instructions."

Moreover, Walsted was never required to mix chemicals or cleansers, because she had difficulty reading the labels on the cleaning products. Indeed, in his deposition testimony, when asked whether Walsted needed help mixing chemicals, Elgert responded:

> Yeah. Ken told me that. We'll I'm the one that—Ken had been helping her prior, and myself, knowing at the level she was reading at, I know that she—she needed to be explained thoroughly. We mixed the chemicals and explained how the chemicals work and how to use them safely, and that was what we did. But we did—We explained what each one did, what it was meant for, and we did mix her chemicals, because at that time we were mixing some glass cleaner with water and different things at that time.

Deposition of Mark Elgert at 31. Therefore, based on this undisputed evidence, and viewing the record in the light most favorable to Walsted, the court finds that Woodbury County had more than enough information to put it on notice that Walsted might have a disability.

Second, although Walsted never specifically requested reasonable accommodation, her failure to make such a request in this case is not fatal. The court recognizes that, "[i]n general, it is the responsibility of the individual with the disability to inform the employer that an accommodation is needed." *Mole,* 165 F.3d at 1217 (quoting *Wallin v. Minnesota Dept. of Corrections,* 153 F.3d 681, 689 (8th Cir.1998) with

quotations in *Wallin* omitted). The court is also mindful that the ADA "does not require clairvoyance." *See Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir.1995). However, "if an employee's disability and the need to accommodate it are obvious, an employee is not required to expressly request reasonable accommodation." *Norris v. Allied–Sysco Food Serv.*, 948 F.Supp. 1418, 1436 (N.D.Cal.1996); *see Miller v. National Cas. Co.*, 61 F.3d 627, 629 (8th Cir.1995) (stating that before an employer must make accommodation for the physical or mental limitations of an employee, the employer must have knowledge that such a limitation exists); *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 69 (3d Cir.1996) (stating that an employer is not expected to accommodate disabilities of which it is unaware); *United States v. City of Denver*, 49 F.Supp.2d 1233, 1241–42 (D.Colo.1999) (stating that if an employee requests accommodation or an employer knows of a disability of a qualified individual, the employer has the obligation to participate in the interactive process of determining an accommodation); *Hypes v. First Commerce Corp.*, 3 F.Supp.2d 712, 718 (E.D.La.1996) (stating that when the employee's limitations are not open and obvious to the employer, the initial burden rests upon the employee or his health care provider to identify the limitation for the employer and the appropriate accommodations); *Stola v. Joint Ind. Board*, 889 F.Supp. 133, 135 (S.D.N.Y.1995) (explaining that the Code of Federal Regulations for the ADA establishes the general proposition that the employer is obliged to accommodate only those disabilities that are obvious or called to its attention by the employee). Indeed, the Seventh Circuit Court of Appeals, in *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir.1996), held that:

> properly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she must specifically say "I want a reasonable accommodation," particularly when the employee has a mental illness. The employer has to meet the employee half—way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help.

*Bultemeyer*, 100 F.3d at 1285.

Moreover, it must be remembered that the regulations provide: "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of accommodation." 29 C.F.R. § 1630.2(*o*)(3). Further, "[i]f an employee with a known disability is having difficulty performing his or her job, an employer may inquire whether the employee is in need of a reasonable accommodation." 29 C.F.R. pt. 1630 app., § 1630.2(*o*). Here, Walsted has a kindergarten education, and an IQ score that places her in the borderline mentally retarded range. Ana Camarillo, a former custodian for Woodbury County and a former co-worker, stated that "it was obvious" that "Gloria had a very significant learning disability," and further that, "it was common knowledge among County employees that Gloria had a significant learning disability, and that she could not read and write." Affidavit of Ana Camarillo ¶ ¶ 3, 4. Based on this evidence, and viewing the evidence in the light most favorable to Walsted, the court finds that Woodbury County was required to initiate an interactive process with Walsted to determine the appropriate reasonable accommodation. *See Fjellestad*, 188 F.3d at 952 (stating that for purposes of summary judgment, the failure of an employer to engage in an interactive process to determine whether reasonable accommodation is possible is *prima facie* evidence that the employer may be acting in bad faith).

Third, viewing the evidence in the light most favorable to Walsted, the court finds

that a fact dispute exists concerning whether Woodbury County made a good faith effort to engage in the interactive process, and that a reasonable jury could conclude that Woodbury County did not engage in an interactive process to determine whether an appropriate reasonable accommodation existed. Prior to her taking the license stickers, Walsted performed her job satisfactorily for over eight years, receiving periodic pay increases. Thus, Walsted's past job performance generates a genuine issue of material fact that had she been provided the reasonable accommodation of periodic training and/or instruction in her new work area, namely, had she been informed of the importance of the license stickers, she would not have taken them. Indeed, in her affidavit, Walsted states:

> I never had a driver's license and I had never bought license plates. I did not know that these stickers were important property. I just thought that they were wrapping stickers, and they were just sitting on the counter.

Affidavit of Walsted ¶ 13. The court notes that, technically, license stickers have little or no inherent value; rather, it is the practical use of license stickers that render them valuable. This is important to note in light of Walsted's undisputed statement that she did not know the importance and value that is placed on license stickers. An analogy befitting to Walsted's action, therefore, is the hypothetical employee who, due to boredom, removes scotch tape from the dispenser only to wrap it around his/her finger and then toss it in the garbage, or picks up a paper clip only to bend and contort the paper clip and then toss it in the garbage, or scribbles and doodles on post-it notes and then tosses them in the garbage. Certainly such a hypothetical employee is not subject to termination for these actions. Accordingly, it seems only fair to the court that before Woodbury County discharged Walsted from her job as a custodian, it should have informed her that the stickers she believed were wrap-

ping stickers with virtually no value, were, in fact, license stickers with value.

Finally, assuming Woodbury County failed to act in good faith by engaging in such a process, Woodbury County has presented no evidence that it would have been unable to accommodate Walsted by periodically instructing and/or training her in her new position. Consequently, there is a genuine dispute as to whether Woodbury County, the employer, acted in good faith and engaged in the interactive process of seeking reasonable accommodation. Quoting a passage from the Third Circuit Court of Appeals in *Taylor v. Phoenixville School District*, 174 F.3d 142 (3d Cir.1999), the *Fjellestad* court explained:

> [B]ecause employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations. In making that determination, the jury is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations.... When an employee has evidence that the employer did not act in good faith in the interactive process, however, we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect. To assume that accommodation would fail regardless of the employer's bad faith would effectively eliminate the requirement that employers must participate in the interactive process.

*Fjellestad*, 188 F.3d at 953–54 (quoting *Taylor*, 174 F.3d at 163). Therefore, the court concludes that a genuine issue of material fact exists as to whether Woodbury County acted in good faith and engaged in the interactive process of seeking reasonable accommodations.

### 4. Walsted's termination

To withstand summary judgment on her ADA claim, Walsted must also present evi-

dence that the circumstances of her discharge give rise to an inference of unlawful disability discrimination. Walsted argues that because she has raised a genuine issue of material fact concerning Woodbury County's failure to make reasonable accommodations for her disability, Woodbury County has directly violated 42 U.S.C. § 12112(b)(5)(A) of the ADA, which defines "discriminate" to include "not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability." Conversely, Woodbury County asserts that, regardless of whether Walsted can demonstrate that she was a qualified individual capable of performing the essential functions of her job with some reasonable accommodation, it has proffered a legitimate, nondiscriminatory reason for discharging her: Her propensity towards theft. Woodbury County's proffer of a legitimate, nondiscriminatory reason for its adverse employment action moves this case to the third stage of the *McDonnell Douglas* analysis, which is whether Walsted can generate a genuine issue of material fact as to whether Woodbury County's proffered reason is a pretext for discrimination. *S–B Power Tool*, 75 F.3d at 365.

Woodbury County relies on the Eighth Circuit Court of Appeals's decision in *Harris v. Polk County, Iowa*, 103 F.3d 696 (8th Cir.1996), to support its argument that discharging Walsted for stealing the license stickers is not protected under the ADA. In *Harris*, plaintiff Elaine Harris, after pleading guilty to a shoplifting charge, was fired from her job as a legal stenographer in the county attorney's office. Four years later, Harris reapplied for her old job, stating that the mental health problems that had caused her to shoplift in the past were resolved. When a legal stenographer's position became available, however, the county attorney refused to consider Harris because she had a criminal record. Thereafter, Harris filed an employment discrimination lawsuit, contending that the county attorney violated the ADA. On appeal from the district

court's grant of summary judgment to the County, the Eighth Circuit Court of Appeals affirmed the district court, holding:

> In our view, summary judgment was appropriate because Harris failed to present any evidence tending to show the reason given by the county attorney was a pretext for disability discrimination. *See Price v. S–B Power Tool*, 75 F.3d 362, 365–66 (8th Cir.), *cert. denied*, 519 U.S. 910, 117 S.Ct. 274, 136 L.Ed.2d 197 (1996).

*Harris*, 103 F.3d at 697. After affirming the district court's decision that summary judgment was appropriate based on this reason, the *Harris* court subsequently addressed Harris's other argument that the ADA prohibits the county attorney from using her criminal record to reject her application because her shoplifting was caused by a mental illness. The *Harris* court stated:

> the ADA does ·not require employers to "overlook infractions of [the] law." *Despears v. Milwaukee County*, 63 F.3d 635, 637 (7th Cir.1995). We agree with the courts of appeal that recognize an employer may hold disabled employees to the same standard of law-abiding conduct as all other employees.

*Harris*, 103 F.3d at 697. Thus, based on this case, Woodbury County argues that its reason for discharging Walsted—that is, her propensity towards theft—is legitimate and not protected under the ADA since it is not required to "overlook infractions of [the] law," and it may hold Walsted to the same standard of law-abiding conduct as all other employees. *Harris*, 103 F.3d at 697 (citation omitted). This court, however, concludes that this paragraph is *dicta*. This is so because once the Eighth Circuit found that there was no genuine issue of material fact on the issue of pretext, because Harris had failed to present evidence tending to show that the reason given by the county attorney was a pretext for disability discrimination, the Eighth Circuit's subsequent

discussion concerning whether or not an employer can lawfully refuse to hire a potential employee based on conduct caused by a mental impairment, is not central to the holding. In other words, it is *dicta.* Therefore, because the court concludes that the language in *Harris* concerning whether or not an ˙ employer can lawfully refuse to hire a potential employee based on conduct caused by a mental impairment is *dicta,* it is not binding on this court's decision.

Although the court is not bound by this paragraph in *Harris,* the court nonetheless expresses grave reservations about the implications of the language contained in this paragraph given the line of authority cited in support of the overly-broad proposition that, under the ADA, employers are not required to "overlook infractions of [the] law," and that employers may hold disabled employees to the same standard of law-abiding conduct as all other employees. *Harris,* 103 F.3d at 697 (citation omitted). Indeed, as will be demonstrated, the authorities cited by the *Harris* court for this proposition are inapposite.

Under the ADA, there is a single reference to disability-caused misconduct, where, an employer is authorized to disregard the fact that the misconduct or prior performance may be caused by a disability and where the employer can hold the disabled person to exactly the same conduct as a non-disabled person. 42 U.S.C. § 12114(c)(4). This section provides that employers:

> (4) may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee.

42 U.S.C. § 12114(c)(4) (1994); *see also* 42 U.S.C. § 12114(a) (1994) (providing that the term "qualified individual with a disability" under the ADA shall not include illegal drug users when the covered entity acts on that basis). Applying these provisions, several courts have concluded that unsatisfactory conduct caused by alcoholism or drug use are not protected under the ADA. *See Despears v. Milwaukee County,* 63 F.3d 635, 637 (7th Cir.1995) (holding that employee failed to establish disability discrimination under ADA where employee was demoted to job classification that did not involve any driving after losing driver's license for fourth conviction for driving under the influence of alcohol); *Collings v. Longview Fibre Co.,* 63 F.3d 828, 832–33 (9th Cir.1995) (holding that employer did not violate ADA by discharging employees who violated company rules by buying, selling, or using marijuana at the workplace or by returning to work under its influence); *Maddox v. University of Tenn.,* 62 F.3d 843, 846 (6th Cir.1995) (holding that the University did not violate ADA for firing coach where termination did not result from coach's disability but resulted from coach's misconduct of driving under the influence of alcohol and public intoxication); *Williams v. Widnall,* 79 F.3d 1003, 1007 (10th Cir.1996) (stating that "we cannot adopt an interpretation of the statute which would require an employer to accept egregious behavior by an alcoholic employee when that same behavior, exhibited by a nondisabled employee, would require termination."); *Leary v. Dalton,* 58 F.3d 748, 753–54 (1st Cir.1995) (stating that the [Rehabilitation] Act neither prevents employers from holding "persons suffering from alcoholism ... [to] reasonable rules of conduct," nor protects alcoholics from the consequences of their own misconduct); *Little v. FBI,* 1 F.3d 255, 258–59 (4th Cir.1993) (noting that an "employer 'may hold a[n] ... alcoholic to the same standard of performance and behavior to which it holds others, even if any unsatisfactory performance or behavior is related to the person's ... alcoholism."); *Copeland v. Philadelphia Police Dept.,* 840 F.2d 1139, 1149 (3d Cir.1988) (holding in Rehabilitation Act case that employer was

not required to accommodate employee's illegal drug use where such use violated employee's duty to refrain from illegal conduct). Although these cases often state in general terms that a disability is protected while disability-caused misconduct is not, they all make this distinction in the context of alcoholism or illegal drug use. *Nielsen v. Moroni Feed Company,* 162 F.3d 604, 608 (10th Cir.1998).

Significantly, however, the plaintiff's misconduct in *Harris* was not caused by alcoholism or illegal drug use; rather, it was allegedly caused by a mental illness. Nonetheless, the *Harris* court proceeds to rely on the above-mentioned authority, which involves misconduct caused by alcohol and illegal drug use, for the sweeping proposition that employers are not required to "overlook infractions of [the] law," and that employers may hold disabled employees to the same standard of law-abiding conduct as all other employees. *Harris,* 103 F.3d at 697. The *Harris* court, unlike the authority upon which it relies, does not make the distinction that while a disability is protected, disability-caused misconduct, in the context of alcoholism or illegal drug use, is not protected under the ADA. The decision in *Harris,* therefore, overlooks the critically important fact that the authority cited in support of the proposition that employers are not required to "overlook infractions of [the] law," and that employers may hold disabled employees to the same standard of law-abiding conduct as all other employees, recognizes the dichotomy between a disability and disability-caused misconduct only where the disability is related to alcoholism or illegal drug use, which are expressly unprotected under the ADA. 42 U.S.C. § 12114(c)(4); 42 U.S.C. § 12114(a). To extrapolate from 42 U.S.C. § 12114(c)(4) and 42 U.S.C. § 12114(a) that all disability-caused misconduct, regardless of whether or not the disability is related to alcoholism or illegal drug use, is not protected under the ADA, would, in

this court's opinion, effectively undermine the purpose of the ADA.

 The Tenth Circuit Court of Appeals, in *Den Hartog v. Wasatch Academy,* 129 F.3d 1076 (10th Cir.1997), acknowledged the dichotomy between disability versus disability caused misconduct in the context of alcoholism and illegal drug use. The *Den Hartog* court, in stark contrast to the *Harris* court, thoroughly analyzed the circumstances under which an employer can hold a disabled person to exactly the same conduct as a non-disabled person, explaining:

> The text of the ADA makes only one specific reference to "disability-caused misconduct," where an employer is authorized to disregard the fact that the misconduct or prior performance may be caused by a disability and where the employer can hold the disabled person to exactly the same conduct as a non-disabled person. It provides that an employer:

> may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the alcoholism or drug use of such employee. 42 U.S.C. § 12114(c)(4) (1994).

*Den Hartog,* 129 F.3d at 1086. Thereafter, the *Den Hartog* court agreed with the plaintiff that the district court erred by importing the "disability v. disability-caused misconduct" dichotomy into a case in which neither drugs nor alcohol were involved. *Id.* The *Den Hartog* court explained:

> As a general rule, an employer may not hold a disabled employee to precisely the same standards of conduct as a non-disabled employee unless such standards are job-related and consistent with business necessity.[7] .... Pursuant to 42

7. A disabled employee may be held to any

performance criteria that are job related and

U.S.C. 12114(c)(4), employers need not make any reasonable accommodations for employees who are illegal drug users and alcoholics. However, that is in marked contrast to all other disabilities, where the ADA does require that the employer extend reasonable accommodations. Thus, the disability v. disability-caused conduct dichotomy seems to be unique to alcoholism and drugs.

*Id.* at 1086. The *Den Hartog* court then concluded that:

> We therefore disagree with the district court's conclusion that the ADA's general anti-discrimination provision, 42 U.S.C. § 12112(a), contemplates a stark dichotomy between "disability" and "disability-caused misconduct." Rather, the language of the ADA, its statutory structure, and the pertinent case law, suggest that an employer should normally consider whether a mentally disabled employee's purported misconduct could be remedied through a reasonable

consistent with business necessity, so long as the disabled employee is given the opportunity to meet such performance criteria by reasonable accommodation. 42 U.S.C. § 12113(a).

8. Under 42 U.S.C. §§ 12111(3), 12113(b) (1994), an employer may discipline an employee who poses a significant risk to the health or safety of others in the workplace. The fact that an employer may discipline an employee whose "disability-caused misconduct" threatens the safety of others in the workplace, however, does not mean that the employer may discipline an employee whose "disability-caused misconduct" does not pose such a "direct threat" (and does not otherwise violate reasonable job-related qualifications consistent with business necessity or fall within another ADA exception to protection). *See Jones v. American Postal Workers Union National*, 192 F.3d 417, 429 (4th Cir.1999) (holding that "[t]he law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct (threatening the life of his supervisor), even if the misconduct is related to a disability."); *Hamilton v. Southwestern Bell Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998) (holding that "the ADA does not insulate emotional or violent outbursts blamed on an impairment. An employee who is fired

accommodation. If so, then the employer should attempt the accommodation. If not, the employer may discipline the disabled employee only if one of the affirmative defenses articulated in 42 U.S.C. § 12113,[8] 12114 (1994) applies. Otherwise, the employer must tolerate eccentric or unusual conduct caused by the employee's mental disability, so long as the employee can satisfactorily perform the essential functions of his job.

*Id.* at 1088. This court agrees with the dichotomy recognized in *Den Hartog* — that is, while a disability is protected under the ADA, disability-caused misconduct due to alcoholism and illegal drug use is not protected under the ADA. The reason is simple: The ADA expressly contemplates removing from statutory protection unsatisfactory conduct caused by alcoholism and illegal drug use. 42 U.S.C. § 12114(c)(4).[9] The *Den Hartog* court rationalized:

because of outbursts at work directed at fellow employees has no ADA claim."); *Palmer v. Circuit Court of Cook County, Soc. Serv.*, 905 F.Supp. 499, 509 (N.D.Ill.1995) (noting that courts have consistently held that one who displays abusive and threatening conduct toward co-workers is not an otherwise qualified individual), *aff'd*, 117 F.3d 351 (7th Cir. 1997); *cf. Carrozza v. Howard County, Md.*, 847 F.Supp. 365, 367 (D.Md.1994) (holding that disciplinary proceedings are not prohibited even if misconduct is caused by a disability), *aff'd*, 45 F.3d 425 (4th Cir.1995).

9. However, the mere status of being an alcoholic or illegal drug user may merit such protection. *See Williams v. Widnall*, 79 F.3d 1003, 1005 (10th Cir.1996) (alcoholism covered under Rehabilitation Act); *Duda v. Board of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1059 n. 10 (7th Cir.1998) (citing cases finding alcoholism covered under ADA); *Evans v. Federal Express Corp.*, 133 F.3d 137, 139 (1st Cir.1998) (citing cases finding alcoholism covered under both statutes); *Buckley v. Consol. Edison Co. of New York, Inc.*, 127 F.3d 270, 273–74 (2d Cir.1997) (alcoholism and drug addiction covered under ADA), vacated en banc on other grounds, 155 F.3d 150 (2d Cir.1998); *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1180 (6th Cir.1997) (alcoholism covered under ADA).

"[B]ecause Congress only expressly permitted employers to hold illegal drug users and alcoholics to the same objective standards of conduct as other employees even though their disability causes misconduct or poor performance, Congress implicitly did not intend to extend the same employer prerogative to employees with other disabilities."

*Den Hartog,* 129 F.3d at 1086 (citing *Andrus v. Glover Constr. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980)) (emphasis original). Accordingly, because Congress decided to treat drug and alcohol addiction differently from other disabilities by ensuring that employers do not have to go through the accommodation process in these cases, *see Salley v. Circuit City Stores, Inc.,* 160 F.3d 977, 981 (3d Cir.1998) (citing *Den Hartog*), this court concludes that the status-conduct dichotomy exists only in the contexts of alcoholism and illegal drug use. Outside of those contexts, as the Tenth Circuit held in *Den Hartog,* the ADA protects both the disability and the conduct caused by the disability. *See Den Hartog,* 129 F.3d at 1088 (stating that "the employer must tolerate eccentric or unusual conduct caused by the employee's mental disability, so long as the employee can satisfactorily perform the essential functions of his job").

Therefore, having concluded that the language contained in *Harris,* namely that employers, under the ADA, are not required to "overlook infractions of [the] law," and that employers may hold disabled employees to the same standard of law-abiding conduct as all other employees, *see Harris,* 103 F.3d at 697, is *dicta,* the court finds that Walsted has indeed generated a genuine issue of material fact at this stage of the *McDonnell Douglas* analysis. The court finds that Woodbury County's failure to engage in the interactive process in order to determine a reasonable accommodation would give rise to an inference of illicit motive. Bad faith in the interactive process necessarily suggests a desire not to accommodate an employee's disability, or, to put it another way, suggests discriminatory animus. There is consequently an inference of pretext in this case. *Crawford,* 37 F.3d at 1341 ("[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant."); *see also Landon,* 72 F.3d at 628 (holding that where the employer's motivation is material, "a jury must determine this question of fact"). Therefore, genuine issues of material fact at this stage of the burden-shifting analysis also preclude summary judgment in Woodbury County's favor on Walsted's ADA claim.

### B. Walsted's State Law Claim

Having addressed Walsted's federal disability discrimination claim under the ADA, the court turns its attention to Walsted's disability discrimination claim under Iowa law. Iowa Code § 216.6 makes it an unfair or discriminatory employment practice to "discharge" or "otherwise discriminate" against any employee "because of" a disability "unless based upon the nature of the occupation." Iowa Code § 216.6; *Sierra v. Employment Appeal Bd.,* 508 N.W.2d 719, 722 (Iowa 1993). The elements of a case of disability discrimination under Iowa law are that the plaintiff must prove that he or she (1) has a disability; (2) was qualified for the position; and (3) was discharged (or suffered adverse employment decisions) because of his or her disability. *Boelman v. Manson State Bank,* 522 N.W.2d 73, 79 (Iowa 1994).

The central issue here, as was the case with Walsted's ADA claim, is whether or not Walsted can show that she was qualified for the position. Iowa courts look to the ADA, its regulatory interpretations, and its case law in construing a disability claim under the Iowa Civil Rights Act (ICRA). *See Fuller v. Iowa Dept. of Human Servs.,* 576 N.W.2d 324, 329 (Iowa 1998). Thus, the foregoing analysis under

the ADA, also applies to Walsted's ICRA claim. Accordingly, because the court finds that Walsted has generated a genuine issue of material fact as to whether Walsted was "qualified" for the position, the court **denies** Woodbury County's Motion for Summary Judgment on Walsted's claim of disability discrimination under Iowa Code Chapter 216.

## IV. CONCLUSION

Upon review of the summary judgment record as a whole, the court concludes that Walsted has generated a genuine issue of material fact regarding whether her mental impairment substantially limits the major life activities of learning, reading, thinking and concentrating. The court also concludes that Walsted has generated a genuine issue of material fact as to whether or not she is an individual with a disability who, with reasonable accommodation, can perform the essential functions of a custodian. Therefore, the court **denies** Woodbury County's Motion for Summary Judgment on Walsted's ADA claims under 42 U.S.C. § 12102(2)(A)–(C). The court similarly finds that Walsted has generated a genuine issue of material fact as to whether or not she was discriminated against because of her alleged disability under the Iowa Civil Rights Act. Therefore, the court **denies** defendant Woodbury County's Motion for Summary Judgment on Walsted's claim under Iowa Code Chapter 216.

**IT IS SO ORDERED.**